24-25-48 Joseph Vidal v. Donald Minetazzi, et al. A quarter-century ago, in Cologne against Howard, this Court set a floor. In the Court's words, quote, wherever the durational line is ultimately drawn, unquote, 305 days of solitary confinement surely suffice to trigger a liberty interest. The Court declined expressly to set a ceiling, even a presumptive one. Instead, it anticipated the Courts would ultimately draw lower lines in future cases aided by better understandings of solitary confinement's harms. This is exactly the kind of case the Cologne Court anticipated. Mr. Vidal endured 258 consecutive, agonizing days of solitary confinement. And even under so-called standard conditions alone, he was confined to a cell roughly the size of a parking space for 23 hours a day for nearly nine months on end. He could not engage in any programming or social activities or telephone calls, and he left only in mechanical restraints, among other severe deprivations. Published studies are virtually unanimous that even 10 days, any more than 10 days in such conditions, inflict serious harm, as corrections officials themselves outline in their amicus brief in this case. That's why the Envach I circuit recently held that as little as 30 consecutive days can trigger a liberty interest. Can I ask, just in terms of your description of the conditions, when he got transferred to upstate, as I understand it, he actually had a roommate. Am I misunderstanding that? He was subjected to double celling at upstate, Your Honor. Okay. So one of the things I was just trying to figure out is, we're using the term solitary confinement, but is it fair to say what we're really talking about is confinement under these more onerous and more liberty-restrictive conditions? I mean, having somebody else in your cell, it means you're not solitary, right? Or am I? Well, Your Honor, I think this Court in multiple cases, including Ortiz v. McBride, very recently this summer in Walker v. Vellmier, has described double celling and has never suggested that it's sort of mitigating of solitary confinement. Oh, yeah. I'm not saying it's mitigating. It was really a terminology question. I was trying to figure out whether we still call it solitary confinement or whether we call it something else. And I think your answer is no, when it's subject to all these other constraints, we still call it solitary confinement, even if technically it's not solitary. I think that's right. And I think that's what this Court did in Walker this summer. And, you know, I think it's worth turning back to Colon, unless this Court has other questions. Well, let me ask you about what you were saying about we now know we have the First Circuit decision and we have all these studies that say even something as short as 10 days can cause effects. How do we—this is with the Eighth Amendment, right, where we're talking about the evolving consensus and understanding. But we do have this definition of significant hardship. And so how do we sort of think about more recent developments? So in sort of two chunks, I guess, between Colon and Palmer in 2015, when this happened in Mr. Vidal, and between 2015 and now when we're actually making these decisions, how do we think about those evolutions and the new information that we have? So, Your Honor, you're right. There's no Eighth Amendment claim before this Court. The way that I think about it, I guess I would say two parts. So one is, much of this evidence, this understanding of the severe harms of what Mr. Colon endured, was between—Mr. Vidal, excuse me—was between Colon and Mr. Vidal's solitary confinement. So by 2015, we already had a much stronger understanding than the Colon Court did of the severe psychological harms. But even after 2015, right, the question is about the significance of the deprivation that Mr. Vidal experienced. He attested in his affidavit at summary judgment to the agony, to the emotional distress. And those subsequent studies, I think, underscore the depth of what he experienced, right? It's not the case that a study published in 2019 only shows how harmful solitary confinement is in 2019, right? The Court now understands better than before what Mr. Vidal experienced in 2015 itself. And I think it's, you know, the Court's familiar, of course, with some of that research. But I just want to underscore again the amicus brief of the former corrections officials that lays out those points. You know, exposure to solitary confinement leads to severe depression, memory loss, suicidal tendencies, higher and sensitive PTSD, physical harms as well. I think one particularly shocking statistic that this also noted in the Walker case this summer. In New York, in 2014, around the time that Mr. Vidal himself was subjected to solitary confinement, people in New York facilities who were subjected to solitary were seven times as likely to attempt self-harm as prisoners who were not subjected to solitary confinement. Again, all of that goes back to the harm that Mr. Vidal experienced. It was clear enough in 2015. It could not be clearer now. Can I ask you about the timeline a little bit? Can I ask you about the aggregation question in terms of, it sounds like he had something like 90 days, a little less than 90 days, that he's in gen pop for three days during transport or something, and then the 258. So as states have adopted statutes that govern this, they tend, I know at least Connecticut is the one I know, I think Connecticut is seven days at a time or 14 days cumulative in a 30-day period. And so should we and can we think of this as calendar year or out of 365 or do we think of all that time together, which would put us over the 305 and would obviate any need to fight about whether it's an automatic due process, right? Or is that permissible and is it wise to aggregate in that way? I think the court could certainly choose to do that. I'm not aware of a case in which the court has aggregated those non-consecutive periods, but it's certainly relevant to the question of whether this was an atypical and significant hardship, right? The fact that you are in solitary for 338 out of 341 days is absolutely relevant. I do think, of course, given what we know about solitary's severe harms, 258 days to record in this case that's precedent more than suffices. And I think in this sort of case that happens to be counseled on appeal where the issues have been fully aired, it could be productive for this court to sort of shake loose what has, in defendant size at least, become an ossified framework and make clear that even 258 days surely suffices. Thank you, Your Honor. We'll hear from you now. I'll hold my Andrea Trento from the Office of the Attorney General on behalf of the defendant of Pelley's. The district court correctly concluded that there was no material dispute of fact as to whether the plaintiff's SHU assignment implicated a liberary interest protected by the due process clause. In addition, all of the defendants are protected by qualified immunity here, and Officer Ansbach further has established there's no material dispute of fact as to his actual involvement in the alleged due process violations. When you filed the summary judgment motion, you didn't make a qualified immunity argument. Am I wrong about that? I believe we did make a qualified immunity argument as to Defendant Benitazzi. And he was the appellate review officer for the disciplinary proceeding. But the qualified immunity argument that you're making now, I think, is that if, because the case law is kind of vague as to where the durational trigger point is, there's qualified immunity as to all of the defendants if we conclude that there's a trigger that's not explicit in some existing case. Am I misunderstanding that? No. Well, Your Honor is correct. There are two additional qualified immunity arguments that we make. I think Your Honor is focusing on the first one, which is the new argument that Mr. Vidal has on appeal, which is that this Court's framework that it established in Cologne should be scuttled. It shouldn't, you know, whatever Cologne was intending to do, they quote a line from the Cologne opinion by Judge Newman, who wrote the opinion for the Court, who said we'll see where the line gets drawn eventually. That was a portion of the opinion that was only supported by Judge Newman. Judge Newman had advocated for a bright line rule. The rest of this panel did not. Well, no, wait a minute. The we'll see where the line ultimately is was a shared view. I think there should be a bright line at 180 days. That was the Judge Newman-only portion. Am I misreading the decision? Judge Newman was characterizing what his view of the panel opinion would be, but I think more importantly, this Court's interpretation of Cologne and application of Cologne, as recently as Walker, in fact, as recently as the Baltus case this Court issued three weeks ago, has reaffirmed the Cologne framework and said that for those intermediate durations between 101 and 305 days, the district court is to develop a detailed factual record and examine whether the actual conditions imposed as compared to the conditions that nondisciplinary segregated assignments, an individual subject to that, whether they impose an atypical and significant hardship. So there's sort of a couple of pieces. One is saying that the Court in Cologne, which I'd always been saying Cologne, so thanks everybody for helping me get it right, said that it would be helpful to bring this evidence to bear, right? That's a slightly different point from saying that we're concluding that there is no point in that range where, as a matter of law, duration alone amounts to atypical and significant hardship, right? Or are you saying that because the Court called for evidence, that must mean that duration alone, any time within that window, can't trigger the due process protections? That's correct, Your Honor, and that's how this Court has applied Cologne, consistently and repeatedly. And why does it say there's no bright line? That makes it a bright line. And this is not just a case where we're unsure whether there's a bright line. It specifically says, a majority of the panel has decided not to proceed with a bright line approach. Well, the majority of the panel agreed that the 305 days represented the floor. No, it represented that in that case, that was clearly enough, but it expressly says this is not a bright line. So if it's not a bright line, then somewhere between 101 and 305, there may be other cases that satisfy the standard without the plus factor. That's the sort of definition of the lack of a bright line, right? Well, I think the lack of the bright line reflects that it isn't just going to be a duration alone within that period. No, that is the bright line you're asking for. You're saying there is a bright line. Until you get to 305, you cannot do this on duration alone, right? That's your position. That's how this Court has applied Cologne. And so is that Palmer you're relying on in other cases? Where else do you find that? In Walker, the Court, Walker involved a 19-year segregated housing assignment on administrative segregation that had no termination. There was disciplinary housing for 14 years and then five years of administrative segregation. The question in Walker is whether the individual was adequately receiving the periodic review that New York law called for at the time. And so to the extent that, but in so doing, the Court cited Cologne and noted that, you know, for intermediate periods of duration, 101 to 305 days, we instruct district courts to take, make a detailed analysis of the record to determine whether the shoe stay imposes an atypical and significant hardship. Is that part of the holding? It doesn't sound like it's part of the holding. It's not part of the, it's in a footnote, footnote five, I think. I might be wrong. But it's dicta, right? Pardon me, Your Honor? It's dicta. Because it's not presented. I mean, 20-something years is 20-something years. It's not 305 or 304 days, right? It's correct, Your Honor. It's not, it's, the Court did not apply Cologne in that way. But it certainly cited Cologne and it reflects that Cologne's, you know, tripartite framework for assessing whether shoe imposes an atypical and significant hardship continues to have effect. It has guided district courts, certainly numerous times over the years, has guided prison officials in meeting out sentences. And so to the extent this Court believes a departure from that is warranted, it's something that I think it needs to go on bonk to do. On the merits, a departure is not warranted. And that's because several of the issues that the plaintiffs raise, Mr. Vidal raises, are accommodated by the Cologne framework. The first thing they suggest is that, you know, the psychological harm inflicted by disciplinary housing is something that necessitates a departure from that standard. Well, Cologne itself said that a plaintiff in attempting to show the impact of shoe, that it imposes an atypical and significant hardship, should rely on psychological studies into the psychological impact and evidence of the psychological impact in making that establishment. And so Cologne, the framework itself, accommodates the kind of evidence that the plaintiff suggests now require a departure from it. Don't you think, though, that Cologne, in contemplating that kind of evidence, at least I read Cologne as contemplating that our understandings as to the psychological effects of prolonged confinement and isolation will grow and evolve over time, and that it's not that the state of the evidence at the time of 2000 is going to necessarily tell us where the line is in 2025? Am I overreading the discussion in Cologne? Well, I think it accommodates both. But I think it's also the case, Your Honor, that the state of the evidence in terms of as a policy matter as to, you know, how disciplinary, how segregated housing should be used, for one, it has been addressed. It is affecting policy. The 2022 statute that New York passed has, you know, radically changed how segregated housing is used in the state. Now, that doesn't, as a matter of what is atypical and significant hardship, that doesn't retroactively change what was going on in 2015. But you wouldn't deny that going forward, in some case that maybe involved a timeframe that was now, that sets a marker as to what the state of New York thinks is atypical and significant. Absolutely, Your Honor. A case that comes up, you know, post-2022, dealing with that law, and somebody who's complaining about, I was put into administrative segregation for much longer than that period of time. I mean, what is a reasonable expectation? What expectation of liberty that an individual might have is certainly guided by what the prison rules are and what the law is. So that, when we talk about significant hardship, though, we'd be able to take into account, your fellow counsel pointed out some things that had developed by 2014. So, setting aside the 2015 to the present time period, which is much more contentious, and I think I understand your position on, what about things involving between Cologne and 2015? As we define the significance of the hardship, I think atypical is harder, right? Yes, Your Honor. For your opponent. But as to significant hardship, can we take that into Yes, Your Honor. I mean, I think, you know, again, Your Honor referenced the Eighth Amendment, and that is a, you know, traditionally evolving standard that looks at, you know, contemporary mores, et cetera. This atypical and significant hardship standard, it's the courts have not made as clear that that's the case. Even if the court were to take that step and bring that to bear on the analysis, which I can't say that I would, well, even if the court were to do that, Your Honor raises the point about atypicality. Does it have to be both? It has to be both. The standard is atypical and significant. If something is typical, then it's not something that an individual would have a liberty interest in avoiding. So, as long as they do it to enough people, there's no relief? Well, Your Honor, there are other forms of relief. The other forms of relief are cruel and unusual punishment under the Eighth Amendment. This is a question of, is this a kind of that is a normal incident of one sentence that one receives? And given that administrative segregation is something that is available, even at the discretion of superintendents of prisons, to protect the institution, to protect inmates, to, if somebody is likely to, by their mere presence, to cause a disturbance, it's not only for those who commit violations and misconduct and are could be subject to. It's a normal incident of prison life, of a sentence. So, in 2015, in New York, could you be sent to administrative segregation without some sort of process up front? There is a process that needs to happen. The process, I can't remember exactly the timing, but certainly within 30 days, one is entitled to some sort of review, and then there are periodic reviews after that. That was part of the issue in the Watergate. If we're considering sort of what the scope of liberty is or restrictions that sort of go with your sentence that aren't sort of an add-on, it seems to me that it would be hard to rely on the fact that you may be subjected to administrative segregation, at least to the extent that there's a limit to when that can happen without a hearing, right? Yes, Your Honor, without some sort of review. Certainly, there's not indefinite administrative segregation without at least an initial review, and I don't have exactly what that time is. I believe the regulations are in the record. I don't have the record site off the top of my head, but they are in the record, and I'd spell that out. See, my time is up. Thank you, Your Honors. All right. Thank you.  Just a few points, Your Honors. On this question of what Cologne holds, you know, I think my friend for the other side is clearly misreading that case, and as Your Honors pointed out, Cologne did not set a bright-line rule. The portions of the opinion that we rely on are for the entire panel. So, for instance, the Court said, we believe that wherever the durational line is ultimately drawn, 305 days satisfies it. We can anticipate continuing litigation in this area, and then in that we paragraph, the Court also notes that in the next case, the parties might present evidence of the psychological effects. Only after that paragraph did Judge Newman then set forth his own views. Of course, Palmer underscores that. Palmer, at page 64, says, quote, we have explicitly avoided a bright-line rule that a certain period of shoe confinement automatically fails to implicate due process rights. So how does the absence of any kind of bright-line rule and the sort of fuzziness of the law in this area, how does that play in when we start thinking about the assertion of qualified immunity? Well, Your Honor, I think, first of all, as you noted, the defendants aside from Benitazzi did not even assert qualified immunity before the District Court. So certainly that's not before this Court. Even if it's— But is it your position that it's waived or that it would be a question for the District Court to consider on remand? Our position is for summary judgment purposes, it is waived, Your Honor. But certainly this Court doesn't have to determine that. This Court could adhere to its long-standing practice of declining to decide qualified immunity issues when the District Court didn't decide them. And of course we set forth in our reply brief any number of reasons why qualified immunity wouldn't be warranted even if the Court reached it. I think one that I would highlight is this Court has said that in cases like Hanrahan against Dooling and Palmer itself, that two different durations matter when you're talking about the merits versus qualified immunity. For the merits, it's the time actually spent in solitary confinement. For qualified immunity, it's the time of the sentence. And here, Mr. Fadal spent more time or spent less time in solitary confinement than what he was sentenced to. And we sort of set forth in our reply brief that Cologne is the clearly established law for purposes of the sentence. I also want to just briefly, if I may, remark on this detailed record requirement. What this Court has said in case after case is basically that before a District Court finds that there was no liberty interest, it needs to engage in a granular record, a granular comparison, aided by a detailed record built by the defendants. Because this information about sort of typical practices outside of the plaintiff's own experience or typical durations of solitary confinement is peculiarly in their possession. And so what did the defendants do here? Well, the Court has it. It's a J.A. 33 to 36. It's a three-and-a-half-page affidavit. As to conditions, they relied almost entirely on what the regulations say conditions should be, not what they actually are, which this Court has said time and again is insufficient. As to duration, there's one line, the J.A. 35, and it just says, quote, this time is not atypical or significant. That wouldn't even pass muster at the pleading stage, certainly not enough to justify summary judgment for the defendants. In light of regulatory changes, I gather, in the brief it talks about in New York and Connecticut, is this an issue that will cease to come up in the circuit because of the limitations? In other words, are we sort of arguing about a question that might become a little bit obsolete in light of administrative and legislative changes? I would certainly hope so, Your Honor, but I don't think that the Court can count on it, both because, as we know, legislation may not be fully implemented and because, you know, Mr. Vidal is entitled to redress for what he experienced, the violation of due process, and there may be others similarly situated. And so given that, I think it's particularly warranted for this Court to take the opportunity in a counseled appeal, the issues have been fully aired, to decide the issue. Thank you. Thank you, Your Honor. Appreciate it. Thank you both. We will take it under advisement.